HONORABLE RONALD B. LEIGHTON

UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF WASHINGTON
AT TACOMA

PORT OF VANCOUVER, USA,

    Plaintiff,

v.

METRO METALS NORTHWEST, INC., and PACIFIC COAST SHREDDING LLC,

    Defendants.

CASE NO. C17-5571RBL

ORDER

THIS MATTER is before the Court on the parties' cross motions for summary judgment. [Dkt. #s 70 & 75]. This case arises out of the use, maintenance and repair of a dock (Terminal 2, Berth 2, or T2B2) on the Columbia River. The Port of Vancouver built T2B2 in 2000, and since 2004 has leased it to Defendant Metro Metals[1] to export scrap metal. The dock is designed to support large shoreside cranes and has a concrete surface able to support a 1000 pound per square inch live load, rather than the more typical 750 psi. This case arises from damage to that concrete surface, and the issue is which party is responsible for the cost of its repair.

---

[1] Defendant Pacific Coast Shredding is the sole member of Metro Metals Northwest, Inc. The parties have agreed that PCS is as bound by the agreement as Metro is. This Order uses "Metro" for clarity and ease of reference.

ORDER - 1

## A. Background.

Metro began exporting heavy scrap metal from the dock in 2007. By November 2009, both parties wanted Metro to export additional scrap from the wharf and entered into a "Shred Berm Expansion and Repair Agreement" designed to facilitate such an increase. The Agreement provided for a re-arrangement and enlargement of the upland area used to stage scrap for loading onto ships from the dock (revisions "inside the berm"); provided for a minimum annual export amount, and a revised wharfage fee calculation (the amount paid by Metro to the Port for the use of T2B2); and articulated the parties' respective financial, operation and maintenance responsibilities. Of specific import here is the list of the tenant's repair obligations:

- Metro Metals responsibilities:

    - Repair damage to the terminal areas used for scrap steel operations. The Port will determine the extent of repair based on initial condition of damaged areas.

    - Provide asphalt as required, initially and in the future, to protect scrap steel operational areas.

    - Repair Port areas damaged by tracked equipment. The Port requires that tracked equipment be moved into the Terminal 2 storage area by truck – not by driving it across the terminal area.

    - Operate and maintain storm water treatment facility for scrap steel operational area.

    - Pay for terminal modifications as a result of berm extension. A list of these modifications is attached as Exhibit 2 to this agreement.

    - Agree to follow BMPs as may be amended by the parties from time to time.

[Stadler Dec Ex 4; Dkt. # 77]. The Agreement included two exhibits, one of which spelled out in more detail the amounts the parties were going to spend to implement the new arrangement. It included a requirement that Metro repair the existing concrete surfaces damaged by its shredding activities:

| Repair existing concrete and asphalt surfaces damaged by shred activities | Metro Metals | $90,000 est. |

[Stadler Dec Ex 4; Dkt. # 77].

As anticipated, Metro expanded its operations and began exporting far more scrap metal, including heavy metal scrap, or HMS. Within a year, the Port claims, it notified Metro that its operations were damaging the dock. By 2011, the longshoremen working on the dock began expressing their concern that the concrete dock surface was unsafe. It was being "torn up" by Metro's activities: transporting shredded steel (and HMS) to the site in dump trucks, dumping it on to the surface, moving it around with front end loaders, and loading it onto ships with "grapple" (or "Fuchs") cranes. The top layer of concrete was effectively scraped off, exposing or damaging the re-bar underneath.

By October 2011, the Port engaged an engineer (KPFF) to evaluate the situation. KPFF determined and reported that the dock was suffering structural damage. [*See* Krout Dec. Dkt. # 72, Ex. 4] The Port demonstrates that it put Metro on notice that its activities were damaging the dock, and that it was going to have to engage someone to fix it. [*See* November 28, 2011 meeting "Agenda" attached to Krout Dec Dkt. # 72, Ex. 6].

In June 2012 the Port engaged Lakeside Industries to perform emergency repairs (asphalt) on the dock surface, until a permanent repair (new concrete) could be implemented. It did so at a cost of approximately $90,000.

Later that summer, the Port solicited bids for a permanent repair to the dock at T2B2. It ultimately engaged the low bidder, Mowatt, to repair the dock surface. Mowatt did so by the end of 2012, at a cost of almost $1.5 million. Metro continued its operations during Mowatt's repairs, moving its operations to one end of its "area" and then the other. The Port claims that Metro's

Operations Manager was "fully apprised" of the ongoing work. It is not debatable that Metro knew the work was proceeding, and why.

Since the concrete repair was completed, Metro has been maintaining a 4-inch protective asphalt layer over the concrete dock.[2] In 2016, the Port gave Metro the bill for the dock repair work. Metro claimed it was not responsible and refused to pay. The Port sued.

The Port now seeks summary judgment on its breach of contract claim, and a judgment for the cost of the repairs. [Dkt. # 70]. It argues that the contract is unambiguous: Metro Metals agreed to repair the areas of T2B2 that it used, and predictably damaged, including the concrete dock.

Metro Metals opposes the Port's motion, and affirmatively seeks summary judgment on the same claim, arguing there was never a meeting of the minds because it never intended to agree to pay for any repairs to the concrete dock, rendering the agreement "unenforceable and void." It claims it agreed at most to retrospectively repair the berm area it was vacating (upland from the concrete dock). It claims it never agreed to repair the concrete dock in the future, because it did not consider that area part of the terminal that it used ("[Metro] always understood its scrap steel operational area at Terminal 2 as the asphalt shred berm, not the concrete Dock itself."). [Dkt. # 75 at 11].

Metro also argues that any agreement imposed on the Port a condition precedent— performing an "initial survey" of the dock's condition— before it could require Metro to perform or pay for any repairs. Indeed, it claims that the Port's failure to conduct such a survey was a material breach of the agreement excusing Metro's performance. Metro argues that if it did not

---

[2] The Port points out that the Agreement requires this asphalt protection. Metro's failure to maintain it prior to the dock repair is a breach of the Agreement; it is not evidence that the Agreement does not impose that obligation.

have an enforceable repair obligation, the Port's alternative quasi-contract claim fails as a matter of law, because the repair could not have conferred a benefit on Metro. Finally, in the alternative, Metro argues that the Port's quasi-contract claim must fail where there is an actual contract governing the same subject matter.

**B. Discussion.**

Summary judgment is proper "if the pleadings, the discovery and disclosure materials on file, and any affidavits show that there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c). In determining whether an issue of fact exists, the Court must view all evidence in the light most favorable to the nonmoving party and draw all reasonable inferences in that party's favor. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248-50 (1986); *Bagdadi v. Nazar*, 84 F.3d 1194, 1197 (9th Cir. 1996).

A genuine issue of material fact exists where there is sufficient evidence for a reasonable factfinder to find for the nonmoving party. *Anderson*, 477 U.S. at 248. The inquiry is "whether the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law." *Id*. at 251-52. The moving party bears the initial burden of showing that there is no evidence which supports an element essential to the nonmovant's claim. *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986).

Once the movant has met this burden, the nonmoving party then must show that there is a genuine issue for trial. *Anderson*, 477 U.S. at 250. If the nonmoving party fails to establish the existence of a genuine issue of material fact, "the moving party is entitled to judgment as a matter of law." *Celotex*, 477 U.S. at 323-24. There is no requirement that the moving party negate elements of the non-movant's case. *Lujan v. National Wildlife Federation*, 497 U.S. 871 (1990). Once the moving party has met its burden, the non-movant must then produce concrete

evidence, without merely relying on allegations in the pleadings, that there remain genuine factual issues. *Anderson*, 477 U.S. 242, 248 (1986).

Contracts are to be interpreted to give effect to the parties' intentions. *Berg v. Hudesman*, 115 Wash.2d 657, 663, 801 P.2d 222, 226 (Wash. 1990). Contract interpretation is a question of law if it is unnecessary to rely on extrinsic evidence, or if only one reasonable inference can be drawn from the extrinsic evidence. *Tanner Elec. Corp. v. Puget Sound Power & Light Co.*, 128 Wash.2d 656, 674, 911 P.2d 1301, 1310 (Wash. 1996).

The Port's articulation of the rule of contract interpretation is accurate: "If a contract is unambiguous, or its language, in context, has but one reasonable meaning, a court may grant summary judgment even if the parties dispute the legal effect of a term or provision." *Mayer v. Pierce County Med. Bureau, Inc.*, 80 Wn. App. 416, 420, 909 P.2d 1323 (1995) (citing *Voorde Poorte v. Evans*, 66 Wn. App. 358, 362, 832 P.2d 105 (1992). The Port argues that the terms of the agreement are unambiguous, and they require Metro to repair the damage to the terminal areas used for scrap steel operation.

Metro's effort to interject some ambiguity or alternate meaning into the clear contract terms fails as a matter of law. Its claim that it thought the contract only referred to the asphalt-covered "berm area" does not make sense considered in light of the objective evidence, including photographs documenting the area and its use over time, and the contract itself. KPFF documented Metro's HMS stacked right on the concrete portion of the dock, waiting to be loaded onto ships docked at the dock. The contract language (and the exhibit, describing existing damage to "concrete," not just asphalt) in the context of Metro's ongoing T2B2 operations is plain and unambiguous. Metro used the terminal area that plainly included the concrete dock.

Metro cannot manufacture a question of fact, or a contract defense, by claiming that it subjectively meant something else entirely.

Metro's second argument, that the Agreement imposed on the Port a condition precedent (namely, to conduct a formal pre-contract survey of the dock's condition) is equally unavailing. Metro complains that the Port did not "formally document" the dock's condition at the time of the contract or at the time the new shred berm was completed, a year later. But the Agreement makes no reference to a formal survey or documentation; the operative phrase says the Port will determine the extent of the repair Metro must undertake, based on the initial condition of the damaged areas. It does not describe a conditional[3] obligation.

Nor was such a formal survey required to ascertain the damage. The dock was only four years old at the time of the agreement. It is the same age as the adjacent dock to the west. The volume of material processed in the berm and on the dock was far less than when the damage was thoroughly documented. There is no credible argument that the damage KPFF documented existed[4] at the time of the Agreement, and Metro does not really claim that it did. The parties knew the initial condition of the dock.

Metro's better argument is that the dock was already slightly used, so if the repair gave the Port an effectively brand-new dock, it obtained an improvement. This is a damages argument.

If the repair had not been yet completed, and there were factual issues about the necessity of the repair or the reasonable cost to complete it, Metro would have a good claim that the

---

[3] Metro's claim that the Port's failure to conduct such a survey was a "material breach" "excusing" (presumably *all* of) "Metro's performance" under the Agreement demonstrates why this makes no sense. If this were true, Metro could destroy the dock entirely (or even fail to pay for its use) and the Port would have no contractual recourse.

[4] If the concrete dock *was* already damaged to that extent in 2009, the Agreement's Exhibit 2 clearly imposed on Metro the obligation to repair it.

amount of damage presented a triable question. But there is ample evidence that the Port undertook the repairs in a reasonable manner, used the lowest bid, and paid marginally more for microsilica concrete that was "tougher," to avoid having to repeat the repairs. There is no evidence that the repairs were not necessary or reasonable, or that they were not in fact successfully performed.

The Port has established as a matter of law that the Agreement required Metro to repair the dock, and that the Port reasonably performed those repairs in its stead. The actual (and reasonable) cost of the repairs was $1,558,141.46. The Port is entitled to summary judgment on its contractual claim for that amount as a matter of law, and its Motion on this point is GRANTED.

These determinations make the parties arguments about the quasi-contract claims moot, and Metro's motions on them are DENIED as such. But if the contract did not impose on Metro the obligation to repair the damage it caused, or if there were questions of fact about whether it imposed that obligation, the Port's alternate quasi-contract claims would survive summary judgment. A fact-finder could certainly determine that it would be unjust to permit Metro to use the Port's asset to conduct its steel export business quickly and carelessly—to consume its concrete dock—without having to compensate the Port for that benefit.

**C. Conclusion**

The Port's Motion for Summary Judgment [Dkt. # 70] on its contract claim is GRANTED. Metro Metals and Pacific Coast Shredding were and are contractually obligated to repair the concrete dock they leased from the Port for their scrap metal export business, at T2B2. They did not, and the Port reasonably undertook efforts to preserve the dock. There is no evidence that the repair was not required or that it could have been done at a materially lower cost.

Metro's Motion for Summary Judgment [Dkt. # 75] is DENIED. All other pending motions [Dkt. #s 69, 101 and 102] are DENIED as moot.

IT IS SO ORDERED.

Dated this 17th day of October, 2019.

Ronald B. Leighton
United States District Judge